## RHOADS DRILLING CO. v. STATE.

### No. 5051.

Court of Civil Appeals of Texas.
Texarkana.

April 30, 1937.

Rehearing Denied May 6, 1937.

Locke, Locke, Stroud & Randolph and Albert Sidney Johnson, all of Dallas, for appellant.

Blackmon & Barron and A. M. Blackmon, all of Groesbeck, and H. A. Leaverton, of Longview, for the State.

JOHNSON, Chief Justice.

This suit was filed by the officials of Gregg county to recover judgment for taxes alleged to be due against, and to foreclose a tax lien upon the interest of, defendant Rhoads Drilling Company in three tracts of land, a part of the Sabine river bed in Gregg county, known as tract No. 4, tract No. 5, and the east or lower part of tract No. 7, aggregating 203 acres.

The alleged taxable interest in the land is the lease interest granted to Rhoads Drilling Company and Farrell & Co. by the State of Texas, as evidenced by three instruments executed by the Board of Mineral Development, June 18, 1932.

This suit is based on the contention that the contracts evidenced by said instruments constitute "oil and gas leases"; and that the rights and interests granted to and acquired by Rhoads Drilling Company and Farrell & Co. named as lessees therein are such as come within the meaning of "real property" as defined for purposes of taxation by R.S.1925, art. 7146.

The suit was defended upon the alleged ground that the contracts evidenced by the instruments were only contracts of hire, whereby the defendant and Farrell & Co. were employed to work for the State in developing the latter's properties, for compensation in oil and gas to be paid them by the State for their labor and expenditures in drilling and producing same; and that the rights thus acquired by them as such employees are not such as constitute a separately taxable interest in real property.

Trial was had to the court without a jury, upon an agreed statement of facts, from which it appears that defendant and Farrell & Co. went into possession of the land under the contracts and by January 1, 1933, had completed a number of oil wells thereon to production, and other wells were in progress of being drilled; that in April 1933, defendant Rhoads Drilling Company duly rendered in its own name as personal property all the drilling rigs, piping, and other equipment placed upon the land and that the taxes on same had been paid for the year 1933; that in September, 1933, the tax assessor of Gregg county assessed to Rhoads Drilling Company as real property the lease interest in the land so acquired by Rhoads Drilling Company and Farrell & Co. under the above-mentioned contracts. The contracts are alike except as to the land described in each, a copy of which, together with such other stipulations as properly present the case, is contained in the agreement which concludes:

"15-a. It is further agreed that all requirements of the law with respect to the assessment of said taxes claimed, notice of its delinquency, etc., have been complied with in the manner provided by law; and that the facts of this case are sufficient to entitle plaintiff, The State of Texas, and Gregg County, Texas, to a judgment, with a foreclosure of lien on defendant's interest, or estate, in Tracts No. 4, 5 and 7, as described by metes and

bounds at pages 15 and 16 of this agreement, *if,* and in the event only, the court shall hold that such interest, or estate, is legally taxable.

"16. The principal question for decision in this case is whether the contracts aforesaid between the State of Texas and the defendant and Farrell & Company do or do not vest in the defendant and Farrell & Company a taxable interest in the realty described in the contracts hereinabove set forth."

From a judgment in favor of plaintiff, the defendant has appealed. The sole question presented is that of whether or not the contracts vest in appellant and Farrell & Co. such rights, interest, or estate in the land as come within the meaning of "real property" as defined for the purpose of taxation, by R.S.1925, art. 7146, which reads: "Real property for the purpose of taxation, shall be construed to include the land itself, whether laid out in town lots or otherwise, and all buildings, structures and ·improvements, or other fixtures of whatsoever kind thereon, and all the rights and privileges belonging or in any wise appertaining thereto, and all mines, minerals, quarries and fossils in and under the same."

The contract in part reads:

"The State of Texas, County of Tarrant

"Whereas, it appearing to the Board of Mineral Development of the State of Texas, that the bid of the Rhoads Drilling Company and Farrell and Company on the eight several tracts referred to in its solicitation for bids is the highest and best bid, and that it would be to the best interest of the State for the Board to accept the same;

"Now, Therefore, this lease is made and entered into in duplicate on this 18th day of June, A. D. 1932, by and between the State of Texas, acting herein by and through the Board of Mineral Development, composed of R. S. Sterling, Governor of the State of Texas, J. H. Walker, Commissioner of the General Land Office of the State of Texas, and C. V. Terrell, Chairman of the Railroad Commission of this State, hereinafter designated as lessor under authority of, subject to and by virtue of the provisions of Chapter 40 of the General Laws of the State of Texas, passed by the Forty-second Legislature at its second called session, and in pursuance of the award duly and legally made by the Board of Mineral development on the 25th day of May, 1932, at a meeting of said Board called and organized according to law, to the Lessees hereinafter named, and Rhoads Drilling Company, a private corporation with domicile at Fort Worth, Tarrant County, Texas, and Farrell and Company, a private corporation domiciled at Fort Worth, Tarrant County, Texas, hereinafter designated as Lessee,

"Witnesseth:

"1. That Lessor, in consideration of the royalties, covenants, stipulations and conditions herein contained, and hereby agreed to be paid, observed and performed by the Lessee, and for other good and valuable considerations does hereby demise, grant, lease and let the hereinafter described lot, tract or parcel of land unto the Lessee for a period of two years from the date of this lease, and as long thereafter as petroleum oil and/or gas is produced in paying quantities therefrom, for the sole and only purpose of prospecting and drilling for and producing oil and/or gas that may be found and produced, from the following lands, comprising a part of the Sabine River bed in Gregg County, Texas, and more particularly described as follows, to-wit: (Here follows description of property.)

"It is intended by the lessor that this lease, and the other leases executed this day by the Board of Mineral Development to Lessee, shall cover and include all of that area, tract, parcel or lot of land, same being the river bed of the Sabine River in Gregg County, Texas, authorized to be leased by said Board under Chapter 40, Acts of the Second Called Session of the Forty-second Legislature, from a line drawn across the Sabine River at right angles to the center line of the channel of said stream from the point of intersection of the south boundary line of the said Sabine River bed with the west boundary line of Gregg County, downstream with said Sabine River bed to a line drawn across said river at right angles to the center line thereof from the northeast corner of the Silas Baggett Survey, Gregg County, Texas.

"2. In consideration of the premises, the Lessee covenants and agrees, first, to deliver to the credit of Lessor, free of cost, in the pipe line to which Lessee may connect its wells the equal 3/8ths part of all the oil produced and saved from the leased premises; second, to deliver to the credit of the Lessor, free of cost, in the gas line or other container to which Lessee may

connect its wells the equal 3/8ths part of the gas produced and saved from the leased premises, or at the option of the Lessor to pay to the Lessor the value of 3/8ths part of the gas produced, saved and marketed at the market price at the well where gas only is found. In addition thereto, Lessee agrees to deliver to the credit of Lessor, free of cost, in the pipe line to which Lessee may connect its well, an additional 1/16th part of all the oil and/or gas produced and saved from each well, as, if and when produced, until Lessor has received the sum of Five Thousand One Hundred Twenty-Five and No/100ths ($5,-125.00) Dollars, as proceeds from the said 1/16th part of the oil and/or gas run from such well, or at Lessor's option, until oil and/or gas (if, as and when produced) of the market value of Five Thousand One Hundred Twenty-five and no/100 ($5,125.-00) Dollars has been so delivered to Lessor from such 1/16 part of the oil and/or gas run from such well. Lessee shall have the right to use free of cost such gas, oil and water produced or on said land, as is reasonably necessary in carrying out the terms of this agreement. Lessee, also, may use said premises for laying pipe lines and building tanks, power plants and structures thereon to produce, save, treat and take care of oil and/or gas produced therefrom.

"3. To deliver to the credit of Lessor, free of cost, in the pipe line to which Lessee may connect its well, the equal 3.8ths part of all casinghead gas, or gas used for the manufacture of casinghead gasoline, or at the option of Lessor to pay Lessor for the casinghead gas or gas used for the manufacture of casinghead gasoline, the value of 3/8ths of such at the market price thereof at the well.

"4. If no well be commenced on the herein demised tract on or before the 18th day of August, 1932, this lease shall terminate as to both parties unless the Lessee on or before that date shall pay or tender to the office of the State Treasurer in the City of Austin, Travis County, Texas, or to such other State officer authorized by law to receive and accept same for the credit of 'mineral development fund' the sum of One and No/100ths ($1.00) Dollar per acre, which shall operate as a rental and cover the privilege of deferring the commencement of a well may be further deferred for like periods of the same number of days successively. And it is understood and agreed that the consideration first recited

herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also, the Lessee's option of extending that period as aforesaid. This paragraph, however, shall yield to and be subject to the paragraphs number 6 and 7 herein."

Paragraphs 6 and 7 express covenants obligating lessee to protect the demised premises from drainage by wells on adjacent land, not owned by the State, or on adjacent State-owned land where the royalties payable therefrom are smaller than the royalties agreed to be paid by the lessee under this lease. It is further provided in paragraph 7: "Neither the down payment, bonus, delay rentals, or royalties paid or to be paid hereunder shall relieve Lessee from the obligation to protect the premises under the circumstances and in the manner herein mentioned from drainage that may be existing at the time this lease is made, or that may hereafter occur. The prevention of the drainage of the herein demised premises, and the recovery of the petroleum oil and/or gas lying within and under and/or that may hereafter be within and under such premises is the essence of this instrument."

The instrument continues at length to express covenants and conditions imposed upon the grant, in language usually found in the ordinary oil and gas lease, and in addition such as would be fitting to the circumstances and the special provisions of the law under which this lease was executed. In conclusion the instrument reads:

"28. It is agreed that this instrument is not intended as a conveyance or sale to the Lessee of any part of the oil or gas in place; the intention being that Lessee shall acquire title to oil or gas hereunder as above provided, only as and when produced.

"29. This lease shall be binding upon the executors, administrators, successors and assigns of the Lessee. In testimony whereof, the Board of Mineral Development of the State of Texas, has caused this instrument to be signed, executed and delivered in duplicate, this the 18th day of June, A. D. 1932, by the members thereof subscribing their names thereto." (Then follow the signatures and the proper acknowledgments of the members of the Board).

We are unable to agree with appellant's contention that the instrument evidences

an intention to execute a mere contract of hire, investing appellant with only an incorporeal right or license to go upon the land and work for the State in the development of the latter's properties. We think the instrument as a whole clearly shows the intention to execute that character of contract generally known as an oil and gas lease. When applied to a grant of land for the purpose of prospecting for and producing oil and gas therefrom, the term "lease" has a generally well-understood meaning in expressing a main intention as to the character of contract thus designated, regardless of the special covenants and conditions that may be expressly imposed upon the particular grant. And in construing the contract such covenants and conditions should, if possible, be harmonized with and not be permitted to defeat the main intention. In Anders v. Johnson (Tex.Civ.App.) 284 S.W. 1057, 1061, it is said: "It is * * * true that there are many different kinds of mineral leases; but the term 'lease,' when thus used, has a legal significance of which the courts will take judicial notice. Such a 'lease' is more than a license to go upon the land of another and explore for minerals, and is less than unconditional conveyance of the minerals in the soil." Here it will be noted that the Board of Mineral Development expressly designated the kind or character of contract it intended to execute: "Now, therefore, this "lease" is made and entered into * * *," and further designated the parties as "lessor" and "lessee." In paragraph 1 of the lease it is shown that the grant is upon a consideration moving to the State, namely, the royalties to be paid by the lessee, as well as the covenants and conditions to be observed and performed, and "for other good and valuable considerations." For which considerations there is made a positive grant of the premises by the State for a period of time, with possibility of duration thereafter forever: "* * * does hereby demise, grant, lease and let the hereinafter described lot, tract or parcel of land unto the lessee for a period of two years from the date of this lease and as long thereafter as petroleum oil and/or gas is produced in paying quantities therefrom * * *." Then is expressed the purpose of the grant, to prospect for and produce the oil and gas from the demised premises.

In the latter portion of paragraph 1 there is expressed the intention that "this *lease* and the other *leases* this day executed" by the lessor to the lessee shall cover all that particular area authorized to be *leased* by the board under chapter 40, Acts 2d Called Session, 42d Legislature (Vernon's Ann.Civ.St. art. 5421c, § 8—A). Turning to the provisions of the act we find:

"Sec. 8—A. * * * Subsection 2. The Board of Mineral Development is hereby authorized and it is made its duty to advertise for:

"(1) Proposals to lease for oil and/or gas development of the River Beds and Channels in this State.

"(2) For proposals to drill said River Beds and Channels upon considerations involving compensation in oil and/or gas and/or money of the State, whereby the State will receive a proportion of the oil and/or gas as the same is produced, or by way of Advanced Royalties paid in money.

"(3) And for proposals to purchase said minerals in place, or recoverable, without requirement of mineral development. * * *

"Subsection 4. In the event the board shall deem it advisable to reject all bids it may readvertise for bids or may enter into a contract for the drilling of such wells as it may deem advisable, provided, however, that any well or wells which may be drilled by order of the Board of Mineral Development shall be by contract let upon competitive bids to the lowest and best bidder for a completed well. * * *

"Sec. 10. Terms of lease: The areas included herein shall be leased for a consideration, in addition to the cash amount bid therefor, of not less than one-eighth (1/8) of the gross production of oil, or the value of same, that may be produced and saved, and not less than one-eighth (1/8) of the gross production of gas." (Vernon's Ann.Civ.St. art. 5421c, § 10).

The provisions of the act (with few exceptions) leave the particular covenants and conditions of the contracts to be made largely a matter within the sound discretion of the board, yet the act does appear to classify in general character the contracts authorized. Designated in terms of common usage, they are: (1) Oil and gas leases; (2) drilling contracts; (3) mineral deeds. In either of the first (1) or third (3) character of contracts the consideration therefor would be one moving to the State, to be paid by the (1) lessee or (3) grantee, and such contracts would be awarded by

the board to the *highest* and best bidder; while the consideration for the (2) class of contracts would be one moving to the contractor, to be paid by the State, and would be awarded by the board to the *lowest* and best bidder. It is significant that the contract here executed was not only designated as a *lease* but also was awarded to the *highest* and best bidder, and for a consideration moving to the State, to be paid by the lessee.

Paragraphs 2 and 3 of the lease, it will be noted, provide for the payment of the royalties by the lessee to the lessor in the usual manner found in ordinary oil and gas leases. It refers to the wells to be drilled on the property as lessee's wells.

Appellant's construction of the instrument appears to be largely based upon the effect to be given paragraph 28. We do not think paragraph 28 is necessarily required to be given such effect as will destroy the main intention of the parties, as clearly shown by the whole instrument, to execute an oil and gas lease; nor will the literal meaning of the language used in that paragraph have the effect of converting the lease contract into one of mere hire.

When the instrument is considered as a whole, giving effect to all of its parts, including paragraph 28, the following intention is clearly shown: To demise, grant, lease, and let the land itself, presently vesting the lessee and its assigns with the exclusive right to remove and dispose of a portion of the corpus, the oil and gas thereunder, which present exclusive, but determinable, rights to the oil and gas in place shall ripen into absolute fee simple title as and when removed to the surface.

Such rights in the demised premises are corporeal in character, as distinguishable from mere rights in personalty, and the decisions of the Supreme Court have made it clear that such rights constitute a separately taxable interest in real property as defined for that purpose by the statute. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 296, 29 A.L.R. 566; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.(2d) 1021, 1024, 80 S.W.(2d) 741. In the Stephens County Case, supra, it is said: "Though an oil [and gas] lease be so construed as not to pass a present title to gas and oil in place, the courts recognize that it may create a separately taxable estate in land." In Sheffield v. Hogg, supra, Judge Greenwood in express-

ing the general policy of the court as to the effect to be given to an oil and gas lease in the particular here under consideration said: "The oil industry in Texas is largely dependent for development, growth, or prosperity, on the doctrine that the interests we are considering—such as the lessee's and the lessor's estates under contracts which are in customary use in Texas— are interests in land; and hence not subject to parol sale, but have the protection of the statute of frauds, the statutes regulating conveyances and mortgages of real estate, and the statutes requiring the record of instruments affecting title to or liens on land, so that purchasers can rely on deed and lien records and can execute and receive transfers and conveyances in reliance on true abstracts of title and lawyers' correct opinions thereon. Were the stability furnished by these rules withdrawn and the fundamental contracts, on which the oil business so largely rests, be adjudged by the Supreme Court to create mere rights in personalty at some uncertain date in the future, the structure of the business would be seriously, if not fatally, jeopardized."

The judgment is affirmed.